I know you're all familiar with our lighting system, and you have a readout on your side of the podium that tells you how much time you have left when you get a yellow light to begin to bring your argument to a close, and then when the red light appears, finish your short sentence and sit down. And I remind you that rebuttal is for rebuttal only. We call the first case U.S. v. CITGO, and we'll hear first from Mr. Elmer. Good morning, Your Honors. May it please the Court, my name is Nate Eimer. I'm representing CITGO Petroleum on this matter this morning. I thought if I may, I might start out with a couple of things that this appeal is not about. It's not about whether CITGO should in the future be made to cover its tanks. Those tanks were long ago covered. The indictment came down in 2006, and it only charged CITGO with being in violation through 2004. The appeal is also not about whether the tanks were subject to emissions regulations. They clearly were. We didn't contest that. They were subject to regulation by the EPA under subpart KB for emissions regulations from a tank. It was also subject to regulation under Texas regulations. It's undisputed that the tanks never exceeded or didn't exceed the evaporative or the regulation of KB. KB requires certain minimum or maximum vapor pressures. The tanks never exceeded that, so under KB they did not present an environmental hazard, and neither TCEQ, the Texas agency, nor the EPA ever charged CITGO with violating regulation KB. Our appeal is focused on the instruction that was given by the district court as to the meaning of an oil-water separator and its definition. That definition, as the court gave it, basically said that any tank that separates oil from water at a refinery requires a roof to protect it. That would be clearly erroneous, and I think the simplest way to get to why it was wrong is to get back to the CITGO Exhibit 1, which was a trial exhibit that was the EPA's draft background information statement about regulation QQQ as it proposed it. In that background information statement, and we've handed to each of the court, I believe, three pieces of paper. It's all stapled together. But on that first one, it's an excerpt from CITGO Exhibit 1, the EPA's 1985 background information statement, and it classifies the stages of a wastewater treatment plant. It shows that the first stage, which would be the separators, what they called here the API separators, CPI separators, removes free oil and suspended oil solids. But the second stage that was going to be the dissolved air flotation system, other air flotation systems, coagulation, precipitation, also removed oil. And it also removed not just emulsified oil but free oil, a distinction the government would like to make here, to somehow say that our equalization tanks were different and were, in fact, oil water separators. But it was understood by the EPA in 1985 that equalization tanks, dissolved air flotation systems, would, in fact, separate emulsified oil and free oil. Yeah, but the oil water separator was supposed to do most of that work, was it not? Yes, sir, and ours did. The uncontested record here is that our oil water separator, what was called a CPI, the corrugated plate interceptor, took out 70% of the oil. And I think that comes from a government's exhibit 73, which was a study that was done, I believe, in 1996 of our oil water separator to see how effective it was. And that study indicated that 70% of the oil was being taken out by the oil water separator. I thought the government's theory here was that these tanks were de facto oil water separators because the device that was labeled an oil water separator was not doing its work and was dumping that work on the tanks. Now, what do you say to that? I think that's exactly the government's theory. The problem with the theory is that an oil water separator is a defined piece of equipment. I think that's where the argument has been all along. That defined piece of equipment has to have certain things in it according to the definition. Okay, but what about was it – how much work was the oil water separator, the device labeled as such, doing at the time of the violation? The only evidence in the record is the study that was done by CITGO that the government introduced. That study indicated that the average ability of the CPIs, the thing that we all agree is an oil water separator, was taking out 70% of the oil. That is in Government Exhibit 73. Mr. Bogger, one of the contractors, testified at Record 9143 that it was 70% of the oil, not just the free oil, but 70% of the total oil. Davis Ford, an expert called by CITGO, testified at Record 9320-22 that the CPI separator was also taking out 70%. Is that at the time the violation was alleged? Well, it's during the period of the violation, yes, sir. The period of the violation is alleged to be 94 to May of 2000. I'm sorry. I'm sorry. I thought they said something about 50% at some time. So the standard that the EPA sets, which is set forth in CITGO Exhibit 1 against the background information document, says that a functioning separator should take out minimum 50 to 99%. Right. But, I mean, so they had to have some evidence because they obviously persuaded the jury, I suppose, that this API thing wasn't doing its job. No, they had no evidence that it was below 50%. And not only that, that wasn't the test that the court put before it. Right. It never put that test before it. Well, I mean, really the test that the court had is if the equalization tank, you know, accounted for 10% of the oil, that would still be an oil-water separator. Exactly. So it's really not dependent on the facts of the case. Exactly. Exactly. So there wasn't any evidence that the oil-water separator was malfunctioning or was defective in any way? There was evidence that the oil-water separator wasn't functioning as well as CITGO had hoped. Yes, Your Honor. We hoped it would remove more, and we kept trying to improve it. Was there any evidence that it was removing less than 70% of the oil? In Exhibit 73, if one looks at that, there's sort of a daily logging over a period of, I think, months as to how much oil was being removed by the separators, and it fluctuates. Sometimes it's, I think, 90%. Sometimes it's probably below 50%. But the average, which I couldn't say. I probably would go into the 30% range. But the average, which is on Page 4 of Exhibit 73, the average for the period, which is what the EPA talks about in its standard of 50% to 99%, which is the average, the average is 70%. The standard the EPA has set up is an average standard? I believe so, yes, sir. Over what period of time? I don't know that it's that specific. I couldn't say that, Your Honor. Were those variances determined by, like, the density of the oil at the time? Or why from 90% to 30%? I think what the testimony of the record shows is that there are upsets in a refinery, and so large slugs of oil come through. So it's quantity. It's quantity come through. And it overwhelms the CPI, and the CPI couldn't take out what it was able to at other times. And so when it's overwhelmed, it passes through into the equalization tanks, and the equalization tanks did that. And that was understood to be one of the functions of an equalization tank. And one of the things that I'd like to point the Court to, which I think is one of the most compelling pieces to me, is that the EPA itself understood that a function of an equalization tank is to remove oil from water. And it's the only guidance that anyone had up until Sicko's indictment, basically, from the EPA as to what an oil-water separator was. It wasn't a primary function, was it? No, sir. It didn't say it's a primary. That definition of primary doesn't come into the definition of an oil-water separator either. The definition of an oil-water separator, we contend, and I think it's clear, is determined by what's in the oil-water separator. And maybe if I could, if you'd – But I thought you were saying that the function of the equalizer tank was to separate oil from water. Maybe I misunderstood you. It is one of the functions is to separate oil from water, and I think that's why we gave – But what I was saying is that's not what its listed primary function is, is it? No, I think so, and I don't think that was the primary function of Sicko's tanks 116, 117. The consistent testimony from all of the witnesses is that they functioned and functioned as an equalization tank. Even Mr. Hustvedt, who was the drafter of the QQQ regulation, who the government brought to testify in our trial, even Mr. Hustvedt testified that the tanks functioned both as an equalization tank and an oil-water separator. He didn't say one was more important than the other in the function of tank 116, nor is there anything in the regulation which would indicate how to measure what's the primary or secondary function of a tank. And I think that's why looking at it as what's the primary or secondary function is not the way to look at it here. And the way I really came to grips with the definition was to look at the third page, what we handed to the court. And the third page is taken from, again, Sicko Exhibit 1, which is the 1985 government background information document, and the red are labels that we've put on to help me understand exactly what's here. And going back to the definition of an oil-water separator, the definition says it consists of a separation tank, and the separation tank is the main body here of the tank itself, putting aside the two small chambers to the left and the right. That's the separation tank. And to go back to the definition, it says a separation tank, it says consisting of the separation tank including, and then it mentions the forebay and other separation basins. And those are on the far left and the far right, the forebay and the other separation basin. So now an oil-water separator includes, we believe, this whole thing. But the other piece that wouldn't make any sense, unless it was read consistently sicko, is the rest of the items identified in the definition of an oil-water separator are all within the separation tank. The sludge hopper, the grit chamber, the skimmer, all of those are within the separation tank. It would make no sense to specify those as being part of an oil, as being what needs to be covered, as the government claims, because if one were to cover the separation tank, automatically you would be covering all of those. And so it lends credence to the idea that the definition is describing equipment that is in what they think, the EPA thinks, is an oil-water separator. And that takes me now to the Neely letter, which I think is the critical piece that will aid the court in understanding exactly what the government meant by an oil-water separator. So Mr. Neely, in 2001, was the chief of the Region 6 Air Enforcement Group, and he was confronted with the question of whether an equalization tank that was also separating oil from water was an oil-water separator or not. Now, he says that the separation of oil from water in that tank was incidental to its function of it being an equalization tank, sort of consistent with what you've asked, Judge Davis. But that's not how he resolves the question. He resolves the question as to whether it's an equalization tank by looking at the definition of an oil-water separator. And he looks at it and he says that the definition basically requires all this equipment to be there. He says there is no indication in the regulation that an equalization tank would be considered an oil-water separator tank. And then he goes on, the inclusion of the illicit equipment, quote, implies that an oil-water separator tank in the regulation is associated with API separators and enhanced separators such as CPI separators. In other words, Mr. Neely is saying that a simple tank that separates oil from water is not what this regulation covers. Why aren't you making an argument? It was rather unfocused in your brief about the idea that KB specifically refers to equalization tanks, right? Yes. And therefore, the usual interpretive rule is that the more specific controls over the more general. I'm sorry if it was unspecific, but that's why I emphasized this morning. That would have been a hallmark argument to make. I agree, and that's why I emphasized this morning, Your Honor, that these tanks are not unregulated. They're regulated by KB, and we were not indicted under KB. Why did CITCO put tops on the tanks? That's a good question. So in 2002, the TCEQ filed a notice of enforcement against CITCO for being in violation of QQQ for running tank, and this was interesting too, for running tank 117, which was first in line, even though the numbers are reversed. 117 was the one that was closest to the CPI separators. So it charged CITCO with running tank 117 as an oil-water separator under QQQ, and it charged CITCO with running tank 116 as an oil-storage tank, not an oil-water separator. So even that definition isn't consistent with what the government is saying today. CITCO, having had that charge, sat down and tried to negotiate with the government to try and obviate the quarreling with its enforcement agency. It felt that it was in its best interest to try and negotiate, and it did negotiate a settlement with the EPA within months after that, in which it agreed to put covers on the tanks. It didn't admit that that was correct, but it felt as though it wasn't worth running the risk of being wrong. It wasn't worth continuing to argue about it with anybody else. And so it engaged an engineering company to do the design. It spent millions of dollars putting the covers on. And then after all that happened, then it was indicted for not having covers in the tanks before, which is where we stepped in. Why would you need a cover on the equalization tanks but not on the oil-water separator? Well, the oil-water separator has always been covered. Oh, it's always been covered. It's always been covered. There's been no dispute. The CPI separators, sir, have always been. Every one of these vessels that contain oil are covered? No, the DAF unit, which still contains oil, the dissolved air flotation unit, is still uncovered. No one has ever accused us of using that as an oil-water separator. That was specifically exempted. Is it the oil in the mixture that gives off the fumes that you want to control? Well, it's interesting. I've asked about this question. There's a sort of dispute in the science as to whether it's the emulsified and the other VOCs in the liquid itself that are giving off the fumes or so forth and whether the oil layer, in fact, prevents that from happening because the oil layer is basically a seal on top or whether it's the oil layer doing it. But no one has ever said that the emissions from those tanks were in violation of any law. No one has ever measured emissions from those tanks. In fact, the testimony from the government witnesses is that benzene emission, which is the most hazardous of all emissions, was not a problem from those tanks. So as far as anyone is able to show from any of the record and from all of the testing that was there and Judge Rainey's long hearing on victims, which went on for months and months and months, except for two incidents where there were odors apparently from the tank, no one has ever shown that there were any harmful emissions from these tanks. And so as far as we can see, this is a regulatory fight over the meaning of the oil-water separator without any consequence to the environment. I took up some of your time. Did you cover all you wanted to cover? Yes, sir. I apologize. I haven't covered the rule of lenity and our doctrine, but I can do that in rebuttal if the Court wishes. Thank you very much. Thank you, sir. Mr. DiMasio. Good morning, Your Honors. Nicholas DiMasio on behalf of the United States, and may it please the Court. I'd like to address three points here this morning in response to counsel's opening argument. The first one I'd like to address is the factual questions that Your Honors were inquiring into and what the jury specifically found in this case. Second, I'd like to go over the definition of oil-water separator and explain why counsel's argument was incorrect. And thirdly, I'd like to address this issue about subpart KB. The first point that I'd like to make here is there is no sufficiency of the evidence challenged before this Court. This jury found that Sitko purposely used these tanks to separate the floating oil and solids out of their wastewater stream. This Court is required to view the evidence in the light most favorable to the jury verdict. But that is only, I mean, they use every part of the equipment in this entire series of machines to purposely separate the oil from the water. So that doesn't tell us much of anything. The question is whether they purposely violated this regulation, isn't it? No, Your Honor. There's only a knowing mens rea standard in this particular case. All right. Whether they knowingly violated. But you can't get there simply by saying that they were separating oil from water. You've got to tie it to the definition. So the inevitable issue is the legal issue of the definition. Correct. And what I'm trying to argue here is that the work that those particular pieces of equipment were doing was resolved by the jury. The jury had the question before it. Sitko specifically argued to the jury that if they found that these tanks functioned as equalization tanks, they had to acquit. But the way they were under the regulatory scheme, they were all designed and the regulators understood, as I understand it, that these tanks would do some of the separation of the oil from the water. Well, Your Honor, what's important about this is that there's a distinction. I mean, is that right or not? That's not right. And the reason why that's not right is because what Sitko is pointing to is subsequent pieces of equipment in the wastewater treatment process that are designed to break up oil and solution and emulsions. This air flotation system that they're constantly talking about. There was plenty of evidence in the record showing that if the oil that were in Tanks 116 and 117 had made its way into the air flotation system, that system would have broken because it's not designed to handle floating oil and solids in the way that it was occurring. That's why you have equalization tanks, as I understood it, in the process, because they maintain a constant flow level into the air flotation system. Well, equalization tanks, according to the background documents and all of the evidence in trial, are not designed to remove oil and separate oil from water. What they do is they equalize the flow, but they are not. But it's just like the gravy skimmers that they sell that frankly don't always work. They look like a little one-cup measuring cup, and you pour the liquid from your roasting pan into it, and the liquid is at the bottom and the grease floats on top, and therefore you don't get as much grease out when you pour. What you've just described is the function of an oil-water separator, and that's specifically what the jury found Sitko was using Tanks 116 and 117 for. Only if you define oil-water separator in the most generic sense. Which is the way the jury was charged. Well, let's talk about the jury charge because that's also a very important point here. The specific jury charge was the entire definition of oil-water separator was read to the jury. And then subsequently what the district judge instructed the jury was that all of the ancillary parts don't have to be present because, and this is a quote, an oil-water separator is defined by how it is used. So the question that was before the jury was how was Sitko using these tanks? Was it using them to equalize wastewater flows into the air flotation system? Or was it using them to remove the floating oil and solids from the wastewater stream? And what the jury found as a matter of fact was that Sitko was using these tanks to separate the floating oil and solids out of its wastewater stream. And that is precisely the type of operation that is supposed to be covered by the definition of oil-water separator and the entirety of subpart triple Q. But that's a function. Judge Rainey did not define, did not instruct the jury consistent with the definition in the language of the regulation. Sure he did because what the language in the regulation. No, he said that you didn't need to have any of the ancillary equipment in order to be an oil-water separator. And that is not what the regulation defines as an oil-water separator. Well, yes, respectfully, Your Honor, our position is that that is precisely how the regulation defines an oil-water separator because what it says is that it's wastewater treatment used to separate oil from water consisting of a separation tank. And that also includes all of these additional ancillary parts that may be found on an oil-water separator. How come an air flotation device doesn't fall within that definition? Because the purpose of an air flotation system is to separate the emulsified oil, an oil in solution. It doesn't say. It says separate oil from water. It doesn't distinguish emulsified from free oil, from colloidal oil, from what the heck other kinds of oil there are. For that, you need to look to the definition of slop oil. The definition of slop oil says that it means the floating oil in solids that accumulate on the surface. Well, I'm sorry, but subpart QQQ is not so distinguishable. What you're saying is that this is a functional definition. There is no reason to go beyond the first comma according to the functional definition, and that's what Judge Rainey said. It makes the rest of that clause completely irrelevant, and then it's over-inclusive by your own admission, air flotation devices. Respectfully, Your Honor, that's not— Tell me why that ain't so. That's not correct because the point of going beyond that comma is to make sure that the entire piece of equipment that we're dealing with here is covered. But you can see within this that, I mean, it's very, you know, even to a mechanically illiterate eye like my own, you've got the where. You've got the forebay. You've got these other things, and they're all one piece of equipment. Well, so even in this chart that they're showing you, okay, what we would submit is that under their version, you have a question remaining as to whether or not the sludge hopper needs to be covered in this because what they're saying is that the separation tank is this main part, and there are two external separator basins on the ends, and so there's this gap between where the sludge hopper at the bottom is and it goes up to the top. There's this gap between that and the external part. You know what it looks like to me? It looks like to me the chambers of the heart, and you have arteries going in, and you have veins going in and arteries going out, and that looks like the chambers of the heart, which is one piece of equipment, and this is a definition of that device. You know, what EPA said about its definition was that it was intended to cover all of the equipment from the inlet to the outlet. And then they narrowed it. No, they didn't narrow it. What they explained in their final version was that they weren't going to narrow it in response to comments. But then they created a separate deal for equalization tanks. Well, correct, and the reason why they omitted equalization tanks from the regulation specifically was because they're not supposed to be used to separate oil from water, and so they wouldn't have the same emissions profile. The whole point of this regulation— Why would an equalization tank not separate oil from water because they have different densities? Well, because the oil-water separator in the system is supposed to function so that only very, very— Because if an oil-water separator functioned at the level at which you say it's supposed to, which is up to 70%, correct? Fifty percent. At minimum 50%, then the fluid from that goes on downstream, and among other things, it goes into an equalizer, the purpose of which is to keep an even flow into the air flotation system. There may be another removal system in there somewhere, but because you have oil and water, how can it not separate the oil and water in an equalization tank? Well, again, this 50% standard that they're throwing out is not correct because what that refers to is the total amount of separable oil in the wastewater stream, including oil in solution and emulsions, which are not handled by the oil-water separator system. EPA knew that there was some oil going to go over into the equalization tank, did they not? Sure. And so, I mean, isn't it just necessarily so that they knew that some of that oil and water, after it got into the equalization tank, would be separated? Well, so the point here is whether or not— Answer my question. Yeah, so the answer to your question is yes, but the point is that the way SICA was using these equalization tanks went far, far beyond that. Okay, well, that's what I picked up from your brief. You said that to be an oil-water separator, its primary function must be to separate oil from water. Is that still your argument? Yes, because, again, what we're dealing with here is whether or not they knowingly used these tanks as oil-water separators. For the primary purpose. For the primary purpose of separating out the floating oil and solids in the system. The problem with that is I don't see that in the definition anywhere. Well, again, where I would point, Your Honor, to that in the definition is the fact that it says it's used to separate oil from water and it consists of a separation tank. Which also includes, right. Which also includes these other ancillary parts, which I've explained are typically you will find on an oil-water separator. Not all oil-water separators will have all of them or any of them, but if they're on there, they're included. That's the point. Well, I don't know how you can say that. It's in the regulation. They can't not have any of them. Otherwise, it wouldn't satisfy the definition. No, because what we're saying, again, is that includes— EPA is not allowed to just have some vague function definition if they have a specific parts or included definition. Well, right. And as we've explained, includes is an expansive word when it appears in a definition. And includes simply means that these parts are also included in the definition, not that they're mandatory or necessary. See, the other problem I have is the judge in his charge didn't define—he didn't tell the jury. He said if you find that the function of this—these tanks were—the primary function of the tanks was to separate oil from water, that would be consistent with what you're arguing to us, but that's not in the charge. It is in the charge because— Primary? He said it depends upon how they are used. I understand that.  And what you need to find is that as a whole that this jury instruction does not clearly reflect the issues in law. And what we're saying is that this jury instruction clearly instructed the jury. It gave them the understanding that they needed to find that the purpose of these tanks, that they were being used to separate the floating oil and solids out of the wastewater stream. And that's what the jury— I didn't see the type of oil in the charge either. Well, that's in the full definition of oil-water separator as it appears in the Code of Federal Regulations, which was given to the jury, as well as the definition of slop oil and the other portions of the regulation. When you look at this whole thing, the only thing that the judge here instructed the jury was that it simply did not have to find that each and every one of these parts was present on the machine. That's what he instructed the jury, and they found in our favor. And, you know, on this point, the central position of CITGO, the entire core of their argument in this case, is that an oil-water separator is defined by which parts it has. Well, what's interesting about that is that their version of which parts are necessary has changed over time. Well, excuse me, but EPA's has been very consistent until you filed the indictment in this case. And the EPA's, according to the history of this regulation, was that it was the CPI and API water separators. Air flotation systems were separately defined. Equalization tanks were separately defined. So it's not, even if they have modified their grammatical approach to this regulation, the scope of the regulation, as I understand it, defined by EPA, has been very clear and contrary to the way you indicted them. Well, Your Honor, you're referencing the Neely letter and this issue about subpart KB. What did you say about the Neely letter? Correct. Okay, so this is another point that I want to make sure that I make absolutely clear for this court, okay? Subpart KB, which is being addressed in the Neely letter, okay? Subpart KB only applies to storage vessels, which is a separately defined term in the regulation, okay? Storage vessels are in contradistinction to oil water separators. No, but in their equalization tanks, is my understanding. Equalization tank is not a separately defined term in the regulation. No, but KB covers equalization tanks, does it not? KB covers storage vessels. Does it cover equal, yes or no? If an equalization tank is properly defined as a storage vessel, then it can cover it. That's what I'm saying. So what you're saying is you are threading yourself right into the doctrine of lenity here because the regulated party that has an equalization tank does not know whether they fall under KB or QQQ. Is that correct, according to your functional term? No. How can it not be correct? Well, if you look at CITGO's proposed jury instructions, the ones that they gave to the district court. I want EPA's position on this. EPA's position is that subpart KB applies to, quote, unquote, storage vessels as they are defined. Which are not functionally used as oil water separators. Correct. They are not functionally used as oil water separators. But since every equalization tank has a separation of oil and water, it also falls under QQQ, according to your expansive definition. No. And the reason why is because even CITGO argued to the district court that these tanks did not qualify as storage vessels. Okay? That's it. Record on appeal 2088 and 2091. They specifically review the definition of storage vessel that appears in the regulation, and they told the district judge that it should instruct the jury that tanks 116 and 117 did not qualify as storage vessels, and so subpart KB is totally a red herring. Okay? This is just another example of CITGO changing its interpretation over time. If we had come in here charging CITGO with violating subpart KB, their argument would have been we were actively using them to separate oil from water, and so they qualified as oil water separators and not storage vessels. Let me ask you a record question. Do you agree with CITGO's counsel that the evidence was that over a period of time of the violation, the oil water separator or the device labeled as an oil water separator was getting out 70% of the oil? No, Your Honor. We do not agree with that characterization. What evidence is to the contrary? Well, there was plenty of evidence. If you look at that exhibit, he's talking about exhibit 73, wide fluctuations of the amount of oil, of floating oil and solids that are being separated out of the wastewater stream by these pieces of equipment. I believe it went as low as 6% on various days, and so the overall point here is that if you had taken tanks 116 and 117 out of the system, their point is that the oil water separators were working the way they were expected. Well, if you take tanks 116 and 117 out of the system, the testimony at trial by Kevin Cannell was that the air flotation simply would have broken because it could not handle the wide swings in the amount of floating oil and solids that were making their way into the air flotation system. That's simply not what an air flotation system is designed to handle. It's designed to break up oil and solution and emulsions precisely because those are the types of oil that can't be separated by gravity in an oil and water separator. The standard EPA set up was to use an average amount over a period of time, and that average turned out to be 70%. Do you disagree with that? I totally disagree with that. What did your figure show over that period of time? Well, the only place you need to look for in this is because this is, again, a factual question for the jury. It's Kevin Cannell's testimony at 7966 to 7967 that these tanks 116 and 117 were the primary oil-water separators because they removed most of the floating oil and solids from the wastewater stream. That was their purpose and their function, and that's what the jury agreed with us on. And so the only question that's left at the end of the day is whether or not you also had to have all of these ancillary parts. Let me get back to my point about KB because my understanding is that the EPA has taken the position that because equalization tanks are subject to subpart KB, they are not subject to subpart QQQ. You need to look at the facts of what was going on in that letter. Well, the fact is what, but there is a letter to that effect. Is that correct? Where those tanks were incidentally separating out oil from water. They were primarily functioning as storage vessels. Does the letter say this is fact-specific? Yes. It recites the facts as EPA understood, and it says these tanks are incidentally separating out oil from water, and so they can qualify as storage vessels. So from the standpoint of the regulated party, to be careful and to not get indicted for criminal violations, they have to comply with both KB and QQQ because, after all, EPA may swoop down on them with an unpredicted inspection and find that they are actually not functioning as an equalization tank or a storage tank. Is that right? That's not right. Well, why not? How can you get out of that? In this particular case, the environmental manager who had blocked attempts to consult with the state regulators to ask about this question and who had hid the log books that showed how they were using these tanks, specifically admitted at Exhibit 30, and if there is a smoking gun in this case, it is at Exhibit 30, specifically admitted that they were in violation because they were not installing emissions controls on these tanks given how they were using them. That was SICKO's own environmental manager ultimately concluded that, and so to the extent that you're worried about a notice issue here, that should resolve it. Okay. Thank you, Your Honor. Okay, Mr. Aylmer, back to you, sir. Thank you, Your Honor. What made the manager think that the tanks needed to be covered? The manager, I don't think, ever testified the tanks needed to be covered other than at the end. But he was reading testimony. I don't think he's reading testimony about QQQ. The manager, first of all, and there's a great deal of confusion in the record about this, about the competing Texas standard, and I can give Your Honor the cite, but the Texas also has a definition of an oil-water separator, which is one that the government wishes it had in this case. It's a completely functional definition. It basically says any vessel that separates oil from water is an oil-water separator. Maybe it was written by the legislature instead of an agency. Maybe that's why. That's why it's clear and understandable. Exactly. And it gave an exemption for Citgo's tanks because the vapor pressure was so low at Citgo's equalization tanks that Texas didn't cover it because there was an exemption for oil-water separators under Texas law that had a vapor pressure below a certain level. I think it was 1.5 psi or something like that, and Citgo demonstrated that its tanks, in fact, weren't oil-water separators. But there was a concern that the vapor pressure might vary, and he could well have said that they're oil-water separators at some point because he's worried about Texas. There was a huge amount of confusion about that. If I may go back to your point, Judge Jones, the Neely letter that I was referring to before, and I think you referred to, ultimately concludes that the equalization tanks that are separating oil from water, though it does say incidental, are, in fact, covered by KB. That's in the Neely letter. That's the EPA opinion, and I might say that's not just Mr. Neely because Mr. Neely, in the last paragraph of his letter, to make sure that his advice is correct, actually sent his opinion to headquarters at EPA. It went to the very people who wrote the QQQ regulation before it was issued, and it was approved by headquarters, and it was approved by the department or the group that wrote the QQQ regulation as accurate. So I think that's very important. And the definition of a storage vessel for KB purposes is different than the definition that we've been resisting, which is storage vessel for QQQ purposes. Those are very different. For QQQ, a storage vessel is something that comes between the oil-water separator and the drain system. That's a different definition in KB. That's in the plain language of the reg here. Yes, Your Honor. It does not include storage vessels or auxiliary equipment. Exactly, and that's why we've always said for QQQ purposes, this is not an oil-water separator. So I think that is very clear. Let me ask you this. If the evidence, and we haven't read the record completely, but if the evidence supported a finding that this equalizer was a de facto oil-water separator and it was separating more oil from water than any other device, but because CITCO called it an equalizer tank, would that be a defense to this prosecution? Yes, because what EPA chose to do was not adopt the Texas standard for something that's separating oil from water, but adopt a standard that required certain specific equipment and defined the equipment that was an oil-water separator as a CPI or an API or as Neely called it, some advanced separator. It's not just any tank where oil floats to the top. And having chosen to do that, this can't be an oil-water separator. Their safety valve, what ensured the protection of the environment, was KB. KB assured that if what was going into our tanks was causing an environmental hazard, it needed to be covered. We have never been charged with a violation of KB. They've never said that what was being emitted violated any standard. That's never happened at these tanks. What precipitated all this? Was it some complaints of odors? Is that what got this whole thing going? I think it was the result of an inspection that TCEQ did. There was a five-day inspection of our plant in 2002. This followed an earlier inspection in 1999 where TCEQ at that point said that our tanks appeared to be oil-water separators. We hired a lawyer who had been the chief counsel for the TCEQ to review the situation and review the law. He concluded, as we have, that we were not covered by QQQ. He wrote a letter to the TCEQ in 1999 saying we're not covered. TCEQ dropped the charge. We heard from TCEQ that they dropped the charge because they thought we were correct. They came back in 2002 basically with a five-day inspection. In 2002, then, they charged us again. At that point, we started immediately. That charge was June 24th. By August, our environmental manager was writing back to TCEQ saying, all right, look, we'll try and resolve this. If you think there's too much oil coming in, we'll try and first try and fix downstream and see if we can get the CPIs to work better. And we tried that. We tried that for a long time, spent a fair amount of money trying to do that. That was ultimately unsuccessful. It didn't satisfy them. So we finally just gave up and said we'll put roofs on it. And then we got indicted after we did that. Was that when they found the dead ducks in 2006? Yes, Your Honor. Finally, I think given the Neely definition, which clearly is not functional but driven by the equipment, this court should reverse the conviction of SITCO and remand the case back to the district court with a direction that the court enter a finding of acquittal in favor of SITCO because I think it's uncontested that we did not have the equipment there. It's uncontested that these tanks are downstream from the oil water separators, the CPIs, and therefore couldn't be storage vessels under QQQ or deemed to be part of the system. There is no chance and there is no evidence in any way that could result in a conviction of SITCO under this regulation. Okay. Thank you very much. Thank you, Your Honor. I appreciate your time. We have your case.